IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BERNICE McREYNOLDS, as mother and next friend of D.M., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:04-cv-850-MEF (WO) |
| ALABAMA DEPARTMENT OF YOUTH SERVICES, *et al.*, | ) ) ) | [PUBLISH] |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bernice McReynolds ("Plaintiff"), as mother and next friend of her son D.M., brings this action against Defendants Alabama Department of Youth Services, *et al.*, alleging violations of a number of rights under federal law, the United States Constitution, and the laws of Alabama.  The Plaintiff contends that D.M.'s rights were transgressed by the conditions and lack of treatment made available to D.M. at the Alabama Department of Youth Services ("ADYS").  The complaint also seeks relief in connection with a physical altercation between D.M. and ADYS security officers. The Defendants assert Eleventh Amendment and qualified immunity and argue that their treatment of D.M. was well within the boundaries prescribed by federal and state law.  This cause is presently before the Court on the Motion to Dismiss (Doc. #32) filed by the Defendants on March 11, 2005.  After reviewing the submissions of the parties, the Court finds, for the reasons set forth below, that the motion is due to be GRANTED.

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint.  A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations.  *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *see also Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir. 2004) ("A motion to dismiss may be granted only when the defendant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (citation and internal quotations omitted).  In other words, a motion to dismiss only requires a court to determine whether a plaintiff's allegations, if proven, are sufficient to state a recognized claim at law upon which relief can be granted.  In analyzing a motion to dismiss, the Court will accept as true all well-pleaded factual allegations and view them in a light most favorable to the non-moving party.  *See Hishon,* 467 U.S. at 73.

## FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts.

The Plaintiff's son, D.M., is an African-American minor who has suffered from

2

significant emotional problems since the age of five, when he first attempted suicide. D.M. also has a history of auditory and visual hallucinations wherein he sees and hears what appear to be dead people and has been committed to mental institutions to confront these difficulties. On June 30, 2003, D.M. was ordered into the custody of ADYS by the Juvenile Court of Dallas County, Alabama. The Juvenile Court responded to concerns about D.M.'s mental health by directing ADYS to provide D.M. with mental health treatment, substance abuse treatment, drug and alcohol counseling, and treatment as a delinquent and juvenile offender. ADYS ultimately chose to assign D.M. to Mt. Meigs Juvenile Detention Complex. This placement was contrary to the expressed preference of D.M.'s psychiatrist, who advised ADYS that D.M. should be housed at Bryce State Mental Hospital, an institution with purportedly greater resources for dealing with his mental health problems.

The Plaintiff alleges that once D.M. was admitted to Mt. Meigs, those at the facility did not provide measures to ameliorate his mental and emotional illnesses. She further contends that D.M. was taken off of his medication upon entering ADYS custody, which caused him to begin hallucinating once again. During this time, the Plaintiff believes that D.M. was assaulted on several occasions with a nightstick and was the subject of unnecessary physical force at the hands of the Defendants.

In April of 2004, D.M. complained to his dormitory manager that Defendant Emerson Moore ("Moore"), an ADYS intensive treatment unit employee, had violated the mandated staff-student ratio that governs the number of persons allowed out of their rooms at one time.

A few weeks prior to this complaint, D.M. had informed the dormitory manager that Moore had been permitting certain students who were on room confinement out of their rooms to watch television and engage in other activities while disallowing the same exception to other individuals.  The Plaintiff believes that Moore was suspended in response to these reports.

Upon his return, Moore allegedly denied D.M. recreation time in retaliation for D.M.'s complaints.  D.M. questioned this approach, and Moore replied that D.M. should not have complained about the staff-student ratio violations.  In response to this comment, D.M. asked for a complaint form, but Moore denied his request.  D.M. persisted in this demand, and Moore summoned Defendants Billy Ray Cox ("Cox"), James Daniel ("Daniel"), and Robert Howard ("Howard"), all security officers at the Mt. Meigs Complex, to D.M.'s room.

On their arrival, these officers removed D.M.'s mattress from his room and demanded that he take off his clothes.  D.M. refused to comply with this order, and Daniel proceeded to strike him in the back of the leg with his nightstick, causing D.M. to fall to the ground.  Once D.M. was on the floor, Howard held his leg while Daniel removed D.M.'s shoes, socks, and pants.  During this time, Cox attempted to remove D.M.'s shirt; when this effort failed due to D.M's resistance, Cox hit D.M. in the head with his nightstick.  As D.M. continued to hold on to his shirt, Cox delivered several more forceful blows to his shoulder and head. After being hit in the head three times, D.M. began bleeding profusely.  As the struggle proceeded, Cox continued to strike D.M. in the effort to remove his shirt until Daniel noticed the bleeding and pointed it out to Cox.  While Moore himself did not participate in the

altercation, he witnessed the entire attack and did not intervene.

At the conclusion of this confrontation, Cox allegedly made several comments that indicated he had derived pleasure out of the assault. The guards then withdrew from the room and left D.M. bleeding on the floor and without medical attention. Sometime later, Daniel escorted D.M. to the emergency room at Baptist Medical Center, where he received one internal and ten external stitches for his wounds. When D.M. returned to Mt. Meigs he was disciplined for assaulting a person in authority, Cox, and given seven days of "zero level." D.M. contends that he did not at any time assault Cox and that he was disciplined in order to cover up the episode. Further, the Plaintiff alleges that she was not notified of any of the details of the incident until several days later when D.M. informed her of such during a visitation period. Some time prior to this visit, D.M.'s stitches were removed at the detention facility rather than at the hospital.

During his stay at Mt. Meigs, D.M. met with the director of institutional services on three occasions to apprise him of the mistreatment he had experienced and to complain of other adverse conditions at ADYS. The Plaintiff asserts that these concerns were never remedied, and on September 10, 2004, she commenced the instant suit. In her complaint, the Plaintiff alleges violations of the Education for All Handicapped Children Act, the Americans with Disabilities Act, the United States Constitution, and Alabama law stemming from the April 2004 altercation and from D.M.'s general treatment at Mt. Meigs.

## DISCUSSION

**A. Federal Claims**

   1. *Education for All Handicapped Children Act*

The Plaintiff's first claim alleges that the Defendants violated the Education for All Handicapped Children Act by failing to properly assess D.M.'s educational limitations and provide programs in accordance therewith.  This act, now known as the Individuals with Disabilities in Education Act, outlaws discrimination against the handicapped in public education and guarantees access to educational services.   Importantly, compensatory damages are not available under the statute.  *Powell v. Defore*, 699 F.2d 1078, 1081 (11th Cir. 1983).  In "exceptional circumstances," a plaintiff can recover reimbursement for the costs of providing educational services at the plaintiff's own expense where a court later finds those specific services necessary.  *See Burlington School Comm. v. Dep't of Educ.*, 471 U.S. 359 (1985); *Jenkins By and Through Jenkins v. State of Florida*, 815 F.2d 629 (11th Cir. 1987).  However, the Plaintiff has not alleged that she provided any educational services at her own expense, and therefore, she is not entitled to monetary compensation under this statute.  As a result, this claim must be dismissed.

   2. *Americans with Disabilities Act*

The Plaintiff also alleges that D.M. is entitled to protection under the Americans with Disabilities Act ("ADA") and that the Defendants violated this act through their discriminatory treatment of D.M.  Specifically, the Plaintiff avers that the Defendants violated 42 U.S.C. § 12112(a) in their discipline and treatment of D.M.  The Plaintiff does

not identify which particular Defendants are being sued under this claim, so the Court will address the availability of suit against the officer and employee Defendants in their individual and official capacities and the ADYS.

"The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). Congress does have the power to abrogate this immunity, but it may only do so by a clear expression of such an intent pursuant to valid constitutional authority. *Id*. at 363-64. In *Garrett*, the Supreme Court found that Title I of the ADA was not a legitimate exertion of the limited Congressional power to subject nonconsenting states to suits for money damages under federal law. *Id*. at 374. As part of Title I of the ADA, § 12112(a) does not allow for the recovery of monetary damages against state governments or their agencies. *Id*.

The ADYS is without doubt an arm of the state of Alabama. *See Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*, 344 F.3d 1288, 1290 (11th Cir. 2003); *Ex parte Alabama Dep't of Youth Servs.*, 880 So. 2d 393, 399 (Ala. 2003). As a result, it cannot be held liable for monetary damages based on violations of the ADA. Additionally, the officers and employees of the ADYS in their official capacities are the equivalent of the state and are consequently protected from damages actions brought under Title I of the ADA. *See Miller v. King*, 384 F.3d 1248, 1264 n.16 (11th Cir. 2004). Lastly, the Plaintiff cannot sustain her claims against the officer Defendants in their individual capacities because the ADA "does

not provide for individual liability, only employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996). Therefore, all potential Defendants are protected from suit under the ADA, and the Plaintiff's claims must be dismissed.[1]

## B. Constitutional Claims

The Plaintiff brings several claims under 42 U.S.C. § 1983 for alleged violations of the Eighth and Fourteenth Amendments of the United States Constitution. Because the Plaintiff has not specified which claims are brought against which particular Defendants, the Court will examine all claims as to all Defendants.

### 1. *ADYS and Officer Defendants in their Official Capacites*

A suit against a government official in his or her official capacity is considered a suit against the official's office itself. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). When that office is an arm of the state government, the Eleventh Amendment "protects the sovereignty of the state by prohibiting suits when recovery would be paid from state funds." *Robinson v. Georgia Dep't of Transp.*, 966 F.2d 637, 638-39 (11th Cir. 1992); *see Edelman v. Jordan*, 415 U.S. 651 (1976) (defining scope of sovereign immunity under the Eleventh Amendment).

---

[1] While the Eleventh Circuit has determined that Alabama waived its sovereign immunity with regard to claims brought under the Rehabilitation Act, *Garrett*, 344 F.3d at 1292-93, the Court of Appeals has not yet ruled similarly in the context of the ADA, and the Plaintiff has not attempted to argue that waiver is a factor here. *See Gary v. Georgia Dep't of Human Res.*, 323 F. Supp. 2d 1368, 1371-72 (M.D. Ga. 2004) (finding no waiver of Georgia's state sovereign immunity with regard to the ADA). There is also no indication that the Plaintiff seeks injunctive relief, which is available against state governments under the ADA. *See Miller*, 384 F.3d at 1263.

As the discussion above pointed out, the ADYS is an arm of the state.  Consequently, the Plaintiff cannot maintain an action under § 1983 against the ADYS or any ADYS employee in his or her official capacity.  Therefore, all such claims are dismissed.

2. *Officer Defendants in their Individual Capacities*

While the Eleventh Amendment shields state officers from damage suits in their official capacities, these officials are individually amenable to suit under § 1983 for violations of the United States Constitution and federal law.  *See Graham*, 473 U.S. at 165-67.  However, a government official sued in his or her individual capacity under § 1983 may assert qualified immunity as an affirmative defense if he or she was performing a discretionary function.  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).  "Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity."  *Id*.  If the plaintiff fails to furnish sufficient factual allegations at this stage, the defendant officer is entitled to judgment.  *See Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1022 (11th Cir. 2001).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court delineated a two-step analysis for determining whether an officer is eligible for qualified immunity.  The initial inquiry focuses on whether the plaintiff's allegations, if considered true, show that the officer violated a constitutional right.  *Id*.  The absence of a constitutional violation ends the analysis.  *Id*.  However, where a court does find that an officer acted in an unconstitutional

manner, the examination turns to whether that right was clearly established so that the officer had fair warning that his or her conduct was constitutionally prohibited.  *Id*.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation and internal quotations omitted).  This standard does not require a prior court decision to have declared the precise set of facts presently alleged unlawful, "but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 438 U.S. 635, 640 (1987).  "The salient question. . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope*, 536 U.S. at 741.

Here, the Plaintiff alleges numerous constitutional violations stemming from D.M.'s treatment at the Mt. Meigs facility.  Because the Defendants have asserted the defense of qualified immunity, the Court must determine if these allegations substantiate any constitutional violations and, if so, whether the applicable law was clearly established at the time.

a. Eighth Amendment

The Plaintiff's first allegation under § 1983 is that the Defendants violated the Eighth Amendment's prohibition of cruel and unusual punishment by (1) maliciously and sadistically using excessive force to injure D.M. and (2) exhibiting a deliberate indifference to D.M.'s medical needs and desire for protection at the facility.

10

The Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners in cases . . . where the deliberate use of force [by prison officials] is challenged as excessive and unjustified."[2]  *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Whereas the Fourth Amendment's protection against "unreasonable" seizures has been found to produce a purely objective standard in excessive force cases, the Supreme Court has interpreted the "cruel and unusual punishments" language of the Eighth Amendment to encompass a substantial subjective element.  *Graham v. Connor*, 490 U.S. 386, 396-99 (1989).  This subjective factor varies depending on the context of the plaintiff's claim.  For instance, where a prisoner asserts that prison officials responded inadequately to a serious medical need, the Court has required a showing of deliberate indifference in order to sustain a claim. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  The Supreme Court concluded that this approach was appropriate "because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities." *Whitley*, 475 U.S. at 320.  However, where decisions are made and carried out that involve "the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." *Id*.  Thus, the use of force on a prisoner is "deemed legitimate in a custodial setting as long as it is applied in a good faith effort to maintain or restore discipline

---

[2] The Eighth Amendment is the applicable provision for both juvenile and adult prisoners. *See Hill v. Dekalb Reg'l Youth Detention Center*, 40 F.3d 1176, 1185-86 (11th Cir. 1994).

and not maliciously and sadistically to cause harm." *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting *Whitley*, 475 U.S. at 320-21).

As a result, the Eighth Amendment protection against the use of excessive force is violated only by "punishment [that] is physically barbarous [and] punishment involving . . . the unnecessary and wanton infliction of pain or the imposition of pain totally without penalogical [sic] justification." *Evans v. Dugger*, 908 F.2d 801, 803 (11th Cir. 1990).  To establish a claim in this regard, a plaintiff must show (1) that the defendants acted with a malicious and sadistic purpose to inflict harm and (2) that more than a de minimis injury resulted.  *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002).  Courts consider a variety of factors in gauging an officer's subjective appreciation of the legitimacy of the use of force in a given situation including "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Skrtich*, 280 F.3d at 1300 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).  These factors provide the crucial insight into whether an officer acted "maliciously and sadistically to cause harm" or "in a good faith effort to maintain and restore discipline." *Campbell v. Sikes*, 169 F.3d 1353, 1374-75 (11th Cir. 1999).

In applying this standard, courts afford prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 1374

12

(quoting *Hudson*, 503 U.S. at 7) (internal quotations omitted).  Indeed, absent a showing of the requisite specific intent, the "infliction of pain in the course of prison security measure does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."  *Id*. (quoting *Whitley*, 475 U.S. at 319).

The Court's excessive force inquiry focuses on the April 2004 altercation using the four factors discussed in *Hudson*.  Turning first to the need for force, the Plaintiff's complaint concedes that D.M. was persistent in his request for Moore to provide him a complaint form.  Moore responded by summoning the three security officers, and D.M. remained defiant when the officers requested that he remove his clothes.  Daniel then applied the nightstick to the back of D.M.'s leg, causing him to fall to the ground.  Although significant physical force was employed in the subsequent removal of D.M.'s clothing, it appears that the security officers utilized these tactics to obtain compliance rather than to cause harm.  Cox did strike D.M. several times with the nightstick, but the complaint states that these blows were inflicted as D.M. continued to hold onto his shirt.  In fact, Cox abated his use of force once Daniel notified him that D.M.'s head had started to bleed.  The complaint does allege that Cox made statements after the struggle with D.M. that indicated Cox "derived some sense of pleasure" out of "assailing" D.M.  And while such a declaration may provide some insight into Cox's motives, it does not by itself substantiate a constitutional claim of excessive force where the surrounding circumstances demonstrate a

13

need to restore discipline.

The Plaintiff has attempted to justify D.M.'s uncooperative attitude by characterizing the requests of the security officials as "unjustifiable demand[s]." Indeed, the complaint goes on to state that the "Defendant guards were wrongfully in [D.M.'s] room and had no cause" to give such directions. However, the Supreme Court has made very clear that the challenges presented by prison disturbances demand that courts afford prison security "wide-ranging deference" in the preservation of internal order. *Hudson*, 503 U.S. at 7. This position is particularly appropriate where officials must control a minor with known suicidal propensities and a history mental difficulties. Thus, the Court finds that the facts described here present circumstances where the need for the use of force is not only justifiable, but perhaps imperative.

Having found a sufficient need for the use of force, the analysis turns to the relationship between the need for force and the amount of force used. Here, the Court has difficulty second-guessing the actions of the security officers. D.M. refused to comply with the direct orders of the officers, and the amount of force implemented only increased after D.M. continued to resist their efforts. The officers' physical coercion throughout the confrontation appears proportionate to D.M.'s continued defiance and was abruptly halted when they realized that D.M. may have been seriously injured. These actions strongly suggest that the officers were motivated by a good faith desire to restore discipline.

The third factor examines the threat reasonably perceived by the security officers

while the fourth considers the efforts taken by the officers to temper the severity of their response. Although it does not appear that D.M. was an immediate threat to anyone's safety at the facility, an inmate's open disobedience does raise legitimate security concerns. The officers responded with physical coercion but also tempered the severity of the force used through their proportionate efforts to confront D.M.'s increasing resistance.

In the Court's view, this case presents a situation where prison officials are best charged with discerning the appropriate means of controlling their incarcerated population. Through its analysis of the four *Hudson* factors, the Court has not ascertained sufficient indicia of a malicious or sadistic motivation on the part of the Defendant officers to substantiate a constitutional transgression. As a result, the Court concludes that the Plaintiff's complaint does not describe an instance of excessive force in violation of the Eighth Amendment, and this claim must be dismissed.

The Plaintiff also alleges that D.M.'s rights under the Eighth Amendment were violated by the Defendants' deliberate indifference to his medical and psychiatric needs. According to the Plaintiff, the Defendants were deliberately indifferent to D.M.'s medical needs by prematurely removing his stitches at the Mt. Meigs facility rather than returning him to the hospital for further treatment and evaluation. In addition, the Plaintiff makes several assertions that the Defendants did not adequately provide programs and treatment for D.M.'s psychiatric condition.

The Eighth Amendment prohibits prison officials from exhibiting deliberate

indifference to prisoners' serious medical needs. *Estelle*, 429 U.S. at 104. "More specifically, the case law [has] made it clear that an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997). However, a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (quoting *Estelle*, 429 U.S. at 106).

The Eleventh Circuit implements a two-part analysis to assess claims of deliberate indifference. First, the court determines whether there was an objectively serious medical need. *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995); *see also Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A "serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity [of] a doctor's attention." *Farrow*, 320 F.3d at 1243 (citation and internal quotations omitted). Once a serious medical need is established, the plaintiff must demonstrate that (1) the officer had a subjective appreciation of the risk of harm, (2) the officer intentionally disregarded this risk, and (3) the officer's response to that need was poor enough to constitute an unnecessary and wanton infliction of pain that went beyond mere negligence. *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000);

*McElligott*, 182 F.3d at 1255.  The first two factors delve into the subjective awareness and intent of the officer, whereas the third ensures that instances of medical malpractice do not rise to the level of constitutional violation.  *See Estelle*, 429 U.S. at 105.

The Plaintiff has failed to make out any of these elements.  First, while D.M. may have had a serious medical need under this formulation at the time of his injury, the Plaintiff has not made any showing that the removal of the stitches was an obvious risk or that any further injury resulted from the on-site removal.  Without a serious medical need the deliberate indifference inquiry is at an end.  But, even assuming such a need, the Plaintiff has failed to show that any of the Defendants accused of deliberate indifference intentionally disregarded D.M.'s well-being.  Nowhere does the complaint discuss the circumstances of the removal or the qualifications of the individual who performed the procedure.  The Plaintiff provides only a conclusory allegation that "Defendants Wood, Bolling, Rankins, and Coles were aware of intentions to prematurely remove [D.M.'s] stitches and acted with deliberate indifference in allowing the same to be effected."  Such an accusation by itself is plainly inadequate to establish the requisite mental state or the objective insufficiency of the treatment necessary to substantiate a constitutional violation.

The Plaintiff's briefs and complaint also make several vague allusions to the failure of the Defendants to treat D.M.'s psychiatric condition.  Prison officials must not exhibit deliberate indifference to the psychological needs of those who are incarcerated.  *Hardin v. Hayes*, 957 F.2d 845, 849 (11th Cir. 1992).  However, such claims are highly fact-intensive

and require that the court be fully aware of the condition at issue and the details of the state officers' specific acts or omissions. *Waldrop v. Evans*, 871 F.2d 1030, 1033-34 (11th Cir. 1989). The Plaintiff has not provided the Court with the degree of particularity necessary to perform this analysis and cannot sustain this claim. Therefore, all claims of deliberate indifference under the Eighth Amendment must be dismissed.

    b. Fourteenth Amendment

The Plaintiff also brings an assortment of claims based on purported violations of the Fourteenth Amendment. The first of these claims is that the Defendants transgressed D.M.'s substantive due process rights by the forceful removal of his clothing. In addition, the Plaintiff accuses several individuals in management at ADYS with deliberate indifference to the need for policies and procedures designed to prevent such incidents from occurring. The Eleventh Circuit has observed that "the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases . . . where the deliberative use of force is challenged as excessive and unjustified." *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987). To the extent the Eighth and Fourteenth Amendment do overlap to some degree in this context, "the Due Process Clause affords [the Plaintiff] no greater protection than does the Cruel and Unusual Punishments Clause." *Id*. Because the Fourteenth Amendment provides "no greater protection" than the Eighth Amendment in this arena, the above discussion of excessive force is also dispositive of this claim. And without

a constitutional violation arising out of the altercation itself, the Plaintiff cannot substantiate a supervisory liability claim of deliberate indifference on the part of the individuals in management at ADYS.

The Plaintiff's next claim contends that D.M.'s Eighth and Fourteenth Amendment rights were infringed by the retributive actions of Moore.  According to the Plaintiff, Moore violated these rights by denying D.M. recreation time and by refusing to provide him a complaint form in retaliation for D.M. reporting Moore's transgressions of ADYS policy.

This claim is misplaced because neither of these constitutional provisions preserves a prisoner's right to enjoy free speech rights or to be free from retaliatory treatment for the expression thereof.   The first step in the § 1983 analysis is "to isolate the precise constitutional violation with which [the defendant] is charged." *Baker v. McCollan*, 443 U.S. 137, 140 (1979).  In order to allow the Court to perform the highly fact-intensive qualified immunity analysis, a § 1983 complaint must correctly identify the specific constitutional protection claimed and demonstrate that an infraction occurred.  The Plaintiff has not done so here, and the Court must dismiss this claim as well.[3]

Furthermore, the Court must also consider all of the Plaintiff's allegations under the Fourteenth Amendment in light of the Eleventh Circuit's heightened pleading standard.  The Court of Appeals has stated that "[o]nce the defense of qualified immunity is advanced, the

---

[3] The Court's dismissal of the Plaintiff's claim in this regard is not meant to say that the conduct described could not rise to the level of a constitutional infringement if alleged under the appropriate constitutional provision with the requisite level of specificity.

allegations of the complaint take on great importance in a lawsuit." *Marsh*, 268 F.3d at 1022. The heightened pleading standard requires the plaintiff to "allege the relevant facts with some specificity," because a "complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (internal quotations omitted). Such a showing allows the court to examine the factual details of the case in order to "see that the allegedly violated right was clearly established when the allegedly wrongful conduct occurred." *Danielle v. Adriazola*, 284 F. Supp. 2d 1368, 1375 (S.D. Fla. 2003) (quoting *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992)).

All of the Plaintiff's putative Fourteenth Amendment claims fall short of the factual showing necessary to satisfy the heightened pleading standard and thereby overcome the Defendants' assertion of qualified immunity. In many areas of the complaint, the Plaintiff merely asserts that "constitutionally protected rights" were violated by the Defendants' actions, eschewing any effort to assist the Court in assessing the basis or validity of such claims. Other allegations do identify the origin of the rights purported to have been violated but provide very little discussion of the actions that would substantiate the infractions. The Court cannot be compelled to scour the entire constitutional landscape to search for apposite foundational support for the Plaintiff's vague assertions and accusations. Consequently, the Plaintiff's Fourteenth Amendment claims are dismissed.[4]

---

[4] The Court takes notice of the fact that many of the Circuit Courts of Appeal have abandoned the heightened pleading standard in qualified immunity cases in the aftermath of the Supreme

c. § 1985 Conspiracy

As part of the complaint's federal claims, the Plaintiff alleges that the Defendants conspired to cover-up the physical confrontation between D.M. and the security officers in violation of 42 U.S.C. §§ 1985 (2) and (3).  According to the Plaintiff, the security officers engaged in criminal conduct during the altercation with D.M. and conspired to prevent "the authorities" and D.M's mother from discovering these events.  As part of this effort, the Plaintiff alleges that D.M.'s stitches were prematurely removed and that the records of D.M.'s trip to the emergency room were destroyed.

The Plaintiff contends that these actions constitute an unlawful conspiracy under § 1985(2).  As a general matter, this section outlaws conspiracies designed to interfere with the administration of justice in federal and state courts.  *See Kush v. Rutledge*, 460 U.S. 719, 724 (1983).  The language of the statute protects state and federal courts in two separate phrases and under distinct circumstances.  Notably, the clause governing conspiracies involving

---

Court's decision in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002).  *See, e.g., Doe v. Cassel*, 403 F.3d 986, 988-89 (8th Cir. 2005) (abrogating the use of the heightened pleading standard and noting similar results in the First, Second, Third, Sixth, Seventh, Ninth, and Tenth Circuits).  Although the Eleventh Circuit has continued to require a heightened level of specificity in these cases, *Maldonado v. Snead*, 2006 WL 436030 (11th Cir. 2006), the Court points out that the Plaintiff's claims would fail to satisfy even a more lenient notice pleading standard.  In the very least, the Plaintiff must demonstrate the violation of some articulated constitutional right before the Court can ascertain whether the defendant officers are entitled to qualified immunity's protections.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).  Indeed, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," and as such is "an *immunity from suit* rather than a mere defense to liability . . . [that] is effectively lost if a case is erroneously allowed to go to trial." *Saucier*, 533 U.S. at 200-01 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Without mandating such a minimal showing on the part of the plaintiff, defendants would be stripped of the privilege "of resolving immunity questions at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

federal courts does not contain a requirement that the violation be in denial of "the equal protection of the laws." *See* 42 U.S.C. § 1985(2). The Supreme Court has determined that the absence of such a provision negates the necessity of proving a discriminatory intent on the part of the defendant. *Kush*, 460 U.S. at 724. However, the phrase concerning state courts does have this limiting language and requires the plaintiff to allege discriminatory intent. This difference in the elements of each clause is important in this case because the Plaintiff has not specifically identified which clause she proceeds under and has not attempted to establish an intent on the part of the Defendants that would contravene "the equal protection of the laws."

In her complaint, the Plaintiff contends that the Defendants violated this section through their interference with D.M.'s ability to pursue a remedy for a purported assault and battery under Alabama law. The essence of this claim is that the Defendants conspired to prevent D.M. from reporting the allegedly criminal assault to "the authorities." This characterization suggests the Plaintiff's cause is grounded on the second clause of § 1985(2), dealing with state courts, despite this suit's current presence in federal court. Moreover, the Plaintiff has emphasized that the Defendants' conduct interfered with a potential criminal prosecution and has not argued that the Defendants have obstructed her ability to pursue this cause of action.

These considerations have satisfied the Court that the Plaintiff's claim concerns interference with a state court proceeding, and as a result, must fail because it lacks any

description of a conspiracy to deprive D.M. of "the equal protection of the laws."   The Plaintiff has not averred that the actions of the Defendants were motivated in any way by a discriminatory intent violative of equal protection.   Such an assertion is an essential part of a claim under this section, and without it, this claim must be dismissed.

The Plaintiff also alleges that these actions violated § 1985(3).   This section requires: "(1) a conspiracy; (2) for the purposes of depriving . . . any person or class of persons of the equal protection of the laws . . .; and (3) an act in furtherance of the conspiracy; (4) whereby a person is [injured] . . . or deprived of any right or privilege of a citizen of the United States."   *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 970 F.2d 785, 793-94 (11th Cir. 1992) (quoting *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)).   As discussed above, the second element of this formulation specifically requires a showing of an unlawful discriminatory animus behind the defendant's actions.   *Id.* at 794; s*ee also Rodriguez v. Lamer*, 60 F.3d 745, 749 (11th Cir. 1995); *Smart v. Shalala*, 9 F.3d 921, 924 (11th Cir. 1993); *Price v. Tanner*, 855 F.2d 820, 822 (11th Cir. 1988); *Johnson v. Smith*, 696 F.2d 1334, 1336 (11th Cir. 1983).

In this case, the Plaintiff has neglected to allege that the Defendants were motivated by any unconstitutionally discriminatory motive.   Without doing so, the claim under § 1985(3) cannot be sustained and therefore is dismissed.

## C. State-Law Claims

As the Court has determined that all of the Plaintiff's federal claims are due to be

dismissed, the Court finds it unnecessary to analyze the complex issues presented when examining the immunity of state officers under Alabama law.  Pursuant to 28 U.S.C. § 1367(c),  a district court has the discretion to decline the exercise of supplemental jurisdiction if the court has dismissed all claims over which it had original jurisdiction.  *See Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352-53 (11th Cir. 1997). Without any valid federal causes of action, the Plaintiff's complaint does not contain a basis for the Court to assert original jurisdiction over this cause.[5]  After considering judicial economy, convenience, fairness to the parties, and comity, the Court is convinced that the Plaintiff's remaining claims are better left to the Alabama courts.  Therefore, these claims too must be dismissed without prejudice.

## CONCLUSION

For the reasons stated above, it is hereby ORDERED that:

1. The Defendant's Motion to Dismiss (Doc. #32) is GRANTED, and the Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE.

2. The Plaintiff shall have until April 17, 2006 to refile her complaint to restate any claims not resolved on the merits in this opinion.

DONE this the 28th day of March, 2006.


_____
          /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

_____

[5] Diversity jurisdiction does not exist in this case because all litigants hail from Alabama.